IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

TERESA SUE WARNER,

                  Plaintiff,                   CV-08-6001-ST

      v.                             FINDINGS AND
                                    RECOMMENDATION

MICHAEL J. ASTRUE, Commissioner, Social
Security Administration,

                  Defendant.

STEWART, Magistrate Judge:

## **INTRODUCTION**

Plaintiff, Teresa S. Warner ("Warner"), seeks judicial review of the Social Security

Commissioner's final decision denying her application for Supplemental Security Income

("SSI") under Title XVI of the Social Security Act ("SSA"). This court has jurisdiction under

42 USC § 404(g) and § 1383(c)(3). For the reasons that follow, the Commissioner's decision

should be affirmed.

## **ADMINISTRATIVE HISTORY**

Warner protectively filed an application for SSI and disability insurance benefits ("DIB") on October 26, 2002, alleging disability since June 2000.  Tr. 251-52.[1]  Her application was denied initially and upon reconsideration.  Tr. 245-48.  Warner requested a hearing before an Administrative Law Judge ("ALJ"), who issued an unfavorable decision on October 28, 2004.  Tr. 309-24, 554.  The Appeals Council denied Warner's request for review, noting that the ALJ decision was supported by substantial evidence in the record.  Tr. 12-14.  On February 11, 2005, the Appeals Council set aside its decision in order to consider additional evidence, but again found that the ALJ's decision was supported by substantial evidence.  Tr. 7-10.

Warner appealed that decision to this court.  Pursuant to a stipulation of the parties, the court remanded the case to the Appeals Council on December 12, 2005.  Tr. 363-64.  The remand states that in light of additional evidence submitted following the original ALJ decision, the original conclusion that arthritis had not been established might have been in error.  *Id*.  The Appeals Council then remanded the case to the ALJ.  Tr. 361-62.

On February 3, 2005, before a decision could be made on remand, Warner refiled for SSI benefits.  Tr. 578-81.  Warner's application was denied initially and on reconsideration.  Tr. 556-65.  On August 16, 2007, the same ALJ conducted a second hearing at which both Warner and Mark A. McGowan, a vocational expert ("VE"), testified.  Tr. 718-56.  The ALJ issued an unfavorable decision on August 31, 2007.  Tr. 289-308.  The Appeals Council denied Warner's request for review, rendering the ALJ's decision the Commissioner's final decision subject to judicial review.  20 CFR §§ 416.981, 422.210; *Lewis v. Astrue*, 498 F3d 909, 911 (9th Cir 2007).

---

[1] "Tr." refers to the official transcript of the administrative record (docket #12).

2 - FINDINGS AND RECOMMENDATION

## BACKGROUND

Warner was born in 1960, has an eighth-grade education and worked in the past as a cook, bartender, and most recently, motel housekeeper.  Tr. 62, 67, 75, 578.  Warner claims to suffer from a litany of ailments, including chronic pain in her hands, arms, neck, and hips, carpal tunnel syndrome, fibromyalgia, hypothyroidism, degenerative spine disease, and rheumatoid arthritis.

## I.    Onset Date

This case involves both Warner's 2002 and 2005 applications for SSI benefits.  Those applications differ as to the alleged disability onset date.  The 2002 application for SSI and DIB states that the disability beginning June 1, 2000, while the 2005 application states that Warner's symptoms began bothering her on October 18, 2004.  Tr. 251, 583.  The earlier date is when Warner stopped working.  Tr. 61.  The ALJ gave Warner the benefit of the doubt and determined that at no point since both of her alleged disability onset dates had she engaged in substantially gainful employment.  Tr. 296.

## II.    Medical History

On December 20, 2001, Warner reported to her primary care physician, Gerald A. Barker, M.D., that for six or seven years she had been experiencing tingling and numbness in her hands, but had no pain.  Tr. 182.  On January 7, 2002, Dr. Barker diagnosed Warner with carpal tunnel syndrome and referred her to an orthopedist.  Tr. 181.  Orthopedic surgeon Jon E. Lundquist, M.D., performed a surgical release on her left arm on January 29, 2002, and on her right arm on April 12, 2002.  Tr. 131-35, 125-29.

Approximately a month after her last surgery, Warner told Dr. Lundquist that the tingling was gone, but she was now experiencing discomfort radiating up into her forearms. Tr. 140. Dr. Lundquist determined that her discomfort appeared to be inflammatory in nature and anatomically removed from the region of the carpal canals. Tr. 138. By July 31, 2002, he recommended that she obtain a rheumatology evaluation for her discomfort. Tr. 137.

Rheumatologist Simona Boren, M.D., examined Warner in August 2002. Tr. 166. Dr. Boren was unable to find a clear pattern in the laboratory results and made no definite diagnosis. *Id.* A September 2002 examination produced similar findings. Tr. 165. Upon reexamination in November 2002, Dr. Boren observed signs of Finklestein's (an indicator of tenosynovitis), diagnosed Warner with polyarthralgia and probable osteoarthritis, but found no synovitis (an indicator of rheumatoid arthritis) in the wrists. *Id.*

On April 23, 2003, Timothy A. Hill, M.D., a physical medicine and rehabilitation specialist, examined Warner. Tr 187-90. A cervical MRI revealed no evidence of disk herniation or nerve impingement. Tr. 187. Warner displayed a limited range of motion in her wrists, but exhibited no pain behavior and had normal muscle bulk. Tr. 189. Dr. Hill suspected bilateral forearm tendinitis and determined that Warner was limited to a light physical capacity range of work. Tr. 189-90. On June 17, 2003, he narrowed this restriction to sedentary work. Tr. 230. The following month he continued to report that Warner was limited to sedentary work, but could "possibly do light work on an occasional basis." Tr. 228. He recommended that Warner embark upon a stretching routine. *Id.* On June 7, 2004, Dr. Hill recorded that "we have been somewhat reluctant to treat [Warner] with pain medications, as it has been difficult to find an objective cause of ongoing pain. Her symptoms are fairly diffuse." Tr. 224.

In July 2004, Dr. Barker had not found the source of Warner's pain and recommended that she see a pain specialist.  Tr. 674.  Because the pain specialist did not accept her insurance, Warner did not immediately follow through with this recommendation.  *Id.*

In August 2004, Thomas Dreyer, M.D., saw Warner for a consultation on her hand, shoulder, and neck pain.  Tr. 453.  He "saw no thenar wasting, no hand edema," and concluded that surgery was not a good option for her at that point.  *Id.*

In September 2004, Dr. Barker reported that Warner was "disabled from work because of severe chronic neuropathic pain of the neck, shoulders, and both forearms, [which] prevented her from doing work."  Tr. 239.  K. Annette Weller, M.D., also examined Warner that same month. Tr. 646-47.  She reported that Warner's pain could be due to a connective tissue disorder, but a full work-up provided no specific diagnosis.  *Id.*

In December 2004, Dr. Barker again examined Warner and found her condition unchanged.  Tr. 421.  He thought Warner might need a rheumotologist consult.  *Id.*  Although he did not believe that Warner was exaggerating her complaints, he recommended that she see a psychologist or a psychiatrist because stress could worsen her symptoms.  *Id.*

In January 2005, Dr. Barker sent Warner to see rheumatologist William Maier, M.D., who initially assessed that Warner could have rheumatoid arthritis of a type not supported or demonstrated by laboratory testing (seronegative).  Tr. 695.  On January 27, 2005, Dr. Maier found mild synovial thickening in her wrists and noted that x-rays of her hands revealed some small erosions in the metacarpal phalangeal (finger) joints which confirmed his diagnosis of seronegative arthritis.  Tr. 694.  Blood testing performed in May 2005 produced normal results, although Warner continued to complain of a pain level of 10 on a 0-10 scale.  Tr. 687.  Steroids

were not improving her symptoms. *Id.* Dr. Maier concluded that Warner's inflammatory arthritis was under reasonable control and that her "biggest problem at this time appear[ed] to be due to fibromyalgia." Tr. 687.

In June 2005, state consultant Sharon Eder, M.D., completed a physical residual capacity ("RFC") assessment form based on a review of Warner's medical records. Tr. 696-703. Dr. Eder assessed that Warner could lift 10 pounds occasionally and frequently, could stand and walk for at least two hours in an eight hour day, could sit for six hours in an eight hour day and had no pushing and pulling limitations. Tr. 697. Dr. Eder observed that Warner did not directly answer questions about her physical capabilities, often stating "it depends." Tr. 701. Based on these findings, Dr. Eder concluded that Warner was "partially credible" and capable of sedentary work. Tr. 701, 703.

The following month Warner presented at the Cottage Grove Community Hospital complaining of hand pain caused by a fall off her bicycle. Tr. 498.

In August 2005, state consultant Martin B. Lahr, M.D., also reviewed Warner's medical records and completed a physical RFC assessment. Tr. 704-11. He opined that Warner could stand, walk, or sit for six hours in an eight hour day and could lift or carry 10 pounds frequently and 20 pounds occasionally. Tr. 705. He found Warner's claims to be inconsistent with her reported limitations. Tr. 709. For instance, Warner reported that she cannot sit for longer than an hour, but asserted that she spends her days sitting and watching television. *Id.* Dr. Lahr discounted Dr. Barker's disability opinion because there was no diagnosis to confirm neuropathic pain. Tr. 710. He then concluded that Warner was limited to a reduced range of light level work with occasional fingering. Tr. 711.

Dr. Maier's opinion of Warner's ailments and limitations continued to shift.  On May 9, 2006, Dr. Maier observed widespread trigger points and listed Warner's ailments as rheumatoid arthritis and chronic pain.  Tr. 400.  Then on June 5, 2005, he assessed her with persistent synovitis.  Tr. 399.  On August 15, 2006, Dr. Maier reported that Warner's inflammatory disease was under control.  Tr. 459.

Warner presented to Dr. Barker in July 2006 for evaluation of alleged pain radiating from her neck into her left shoulder, down her left arm and into her fingers.  Tr. 405.  He refilled her Percocet prescription.  *Id.*  Later that month an MRI indicated some disk abnormalities.  Tr. 434-36.  There was a "tiny" disk protrusion at C5-C6, and a "small" 2mm disk protrusion at C3-4.  *Id.*  Other mild to moderate degenerative changes were also noted.

Andrew N. Nemecek, M.D., saw Warner at the Oregon Health and Science University ("OHSU") Neurosurgical Spine Center in September 2006 for an evaluation of her chronic neck pain.  Tr. 480-82.  Neurologically Warner was "intact without myelopathy or motor radiculaopathy."  Tr. 480.  Her MRI revealed multiple levels of moderate degenerative disk disease, and some hypointensity of the C2 odointoid process, consistent with rheumatoid disease.  *Id.*  Dr. Nemecek did not recommend surgery.  *Id.*

The following month, Julio A. Gonzalez-Sotomayor, M.D., at the OHSU Comprehensive Pain Center examined Warner.  Tr. 472-79.  Her evaluation revealed no cervical radiculopathy and was "essentially normal."  Tr. 474.  He believed that Warner was a good candidate for multidisciplinary treatment and might get some relief from neuropathic pain medication.  Tr. 478.

In November 2006, the ALJ sent a letter to Dr. Maier requesting his opinion on Warner's capabilities and limitations. Tr. 395. Dr. Maier declined to respond other than to suggest that the ALJ obtain a physical capacity evaluation. *Id.*

On February 26, 2007, Warner presented at the Cottage Grove Community Hospital complaining of neck and back pain and stating that she had used her last Percocet the day before. Tr. 547-48. A physical evaluation revealed tenderness along her neck. Tr. 548. The doctors observed that she was a "vague historian" and prescribed more Percocet. Tr. 547.

In March 2007, Warner was referred to Christopher A. Park, OTR, FABDA, for a functional capacity evaluation. Tr. 505-20. In the manipulation test, Warner received a very low score, "likely due to voluntarily controlled slow upper extremity movement, rather than any deficit in dexterity or prehension." Tr. 509-10. Her endurance to stand, sit, walk, and walk on her heels and toes was good. Tr. 510. In the "hand function sort," she indicated "poor consistency and reliability" and "a tendency to underestimate her physical and functional capabilities." Tr. 512. Warner passed 13 out of 21 tests, demonstrating less than full effort. *Id.* Park reported that she "did not demonstrate positive signs of competitive test performance" and appeared to have "motivational issues with self-limiting behavior." *Id.* Nevertheless, he opined that Warner was only able to work at the sedentary level on a full-time basis. *Id.*

In May 2007, Warner went to the emergency room because of pain in her hip. Tr. 543-44. She was assessed with fibromyalgia and rheumatoid arthritis and given a shot of Toradol. Tr. 544.

## **DISABILITY ANALYSIS**

In construing an initial disability determination under Title XVI, the Commissioner engages in a five step sequential analysis. 20 CFR § 416.920; *Bowen v. Yuckert*, 482 US 137, 140 (1987).

At step one, the ALJ determines if the claimant is performing substantial gainful activity. If so, the claimant is not disabled.  20 CFR § 416.920(a)(4)(i).

At step two, the ALJ determines if the claimant has "a severe medically determinable physical or mental impairment" that meets the 12-month durational requirement.  20 CFR §§ 416.909, 416.920(a)(4)(ii).  Absent a severe impairment, the claimant is not disabled.  *Id.*

At step three, the ALJ determines whether the severe impairment meets or equals an impairment "listed" in the regulations.  20 CFR § 416.920(a)(4)(iii); 20 CFR Pt. 404, Subpt. P, App. 1 (Listing of Impairments).  If the impairment is determined to meet or equal a listed impairment, then the claimant is disabled.

If adjudication proceeds beyond step three, the ALJ must first evaluate medical and other relevant evidence in assessing the claimant's RFC.  The claimant's RFC is an assessment of work-related activities the claimant may still perform on a regular and continuing basis, despite the limitations imposed by his or her impairments.  20 CFR § 416.920(e); Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 (July 2, 1996).

At step four, the ALJ uses the RFC to determine if the claimant can perform past relevant work.  20 CFR § 416.920(a)(4)(iv).  If the claimant cannot perform past relevant work, then at step five, the ALJ must determine if the claimant can perform other work in the national economy.  *Yuckert*, 482 US at 142; *Tackett v. Apfel*, 180 F3d 1094, 1099 (9th Cir 1999); 20 CFR § 416.920(a)(4)(v).

The initial burden of establishing disability rests upon the claimant. *Tackett*, 180 F3d at 1098. If the process reaches step five, the burden shifts to the Commissioner to show that jobs exist in the national economy within the claimant's RFC. *Id.* If the Commissioner meets this burden, then the claimant is not disabled. 20 CFR § 416.966.

## THE ALJ's FINDINGS

At step one, the ALJ found Warner had not engaged in substantial gainful activity at any time since her alleged onset of disability. Tr. 296. At step two, the ALJ determined that Warner has the severe impairments of bilateral carpel tunnel syndrome (successfully resolved by releases in 2002), hypothyroidism, arthritis/tendinitis/fibromyalgia, tobacco use, and more recently, severe degenerative disk disease. Tr. 296. The ALJ found at step three, however, that Warner's impairments, either alone or in combination, do not meet or medically equal the criteria for a listed impairment. Tr. 301.

Next, the ALJ determined that Warner retains the RFC to perform a reduced range of light work. *Id.* She can sit, stand, or walk for six hours in an eight hour day, lift 10 pounds frequently and 20 pounds occasionally, is precluded from repetitive manipulative activities on a frequent basis, but can engage in intermittent or occasional fingering. Tr. 301.

At steps four and five, the ALJ concluded that Warner could not perform her past relevant work, but could perform other work as a touch up screener for printed circuit board assembly, information clerk, cafeteria attendant, and security guard. Tr. 305-06. Accordingly, the ALJ concluded that Warner was not disabled at any point through the date of the ALJ's decision on August 31, 2007, and not entitled to SSA benefits. Tr. 306.

## WARNER'S CHALLENGES

Warner asserts multiple challenges to the ALJ's decision.  She primarily complains that the ALJ rejected the opinions of her treating and examining physicians, as well as her own testimony and the testimony of lay witnesses, and improperly substituted his own opinion for that of her physicians.  Warner also argues that the ALJ failed to pose complete and proper hypothetical questions to the VE.

## STANDARD OF REVIEW

The reviewing court must affirm the Commissioner's decision if the commissioner applied proper legal standard and the findings are supported by substantial evidence in the record.  42 USC § 405(g); *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F3d 1190, 1193 (9th Cir 2004).  "Substantial evidence is more than a mere scintilla but less than a preponderance." *Bayliss v. Barnhart*, 427 F3d 1211, 1214 n1 (9th Cir 2005) (internal quotation marks and citation omitted).  "It is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Orn v. Astrue*, 495 F3d 625, 630 (9th Cir 2007), quoting *Burch v. Barnhart*, 400 F3d 676, 679 (9th Cir 2005).  This court must consider the record as a whole, weighing both the evidence that supports and detracts from the Commissioner's conclusion. *Lingenfelter v. Astrue*, 504 F3d 1028, 1035 (9th Cir 2007), citing *Reddick v. Chater*, 157 F3d 715, 720 (9th Cir 1998).  The reviewing court may not substitute its judgment for that of the Commissioner.  *Id,* citing *Robbins v. Soc. Sec. Admin.*, 466 F3d 880, 882 (9th Cir 2006); *see also Edlund v. Massanari*, 253 F3d 1152, 1156 (9th Cir 2001).  Variable interpretations of the evidence are insignificant if the Commissioner's interpretation is a rational reading of the record. *Batson*, 359 F3d at 1193.

## FINDINGS

**I.    Warner's Credibility**

    **A.    Legal Standards**

Once a claimant shows an underlying impairment which may "'reasonably be expected to produce the pain or other symptoms alleged,'" the ALJ must provide "clear and convincing" reasons for finding a claimant not credible. *Lingenfelter*, 504 F3d at 1036, quoting *Bunnell*, 947 F2d at 344 and *Smolen*, 80 F3d at 1281. The ALJ's credibility findings must be "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony." *Orteza*, 50 F3d at 750, citing *Bunnell*, 947 F2d at 344.

The ALJ may consider objective medical evidence and the claimant's treatment history, as well as the claimant's daily activities, work record, and observations of physicians and third parties with personal knowledge of the claimant's functional limitations. *Smolen*, 80 F3d at 1284. The ALJ may also employ ordinary techniques of credibility evaluation, such as weighing inconsistent statements regarding symptoms. *Id*; *see also* SSR 96-7p, 1996 WL 374186 (July 2, 1996). Once a claimant shows an underlying impairment, the ALJ may not, however, make a negative credibility finding "solely because" the claimant's symptom testimony "is not substantiated affirmatively by objective medical evidence." *Robbins*, 466 F3d at 883 (citation omitted).

///

    **B.    Analysis**

Warner's subjective complaints portray her as a person who is in constant pain; who sits at home and watches television on one channel because she lacks the strength to use the remote; who cannot wear clothes that have buttons or zippers; who has to drive the car with her elbows;

who lacks the strength to hold a book; and whose pain causes her to have poor grooming.
Tr. 274-80, 607-21, 732-39.  If her subjective complaints are taken at face value, Warner is not
capable of working eight hours a day.

Although the ALJ found that Warner's underlying impairments "could reasonably be
expected to produce some of the alleged symptoms," he concluded that her "statements
concerning the intensity, persistence, and limiting effects of these symptoms are not entirely
credible."  Tr. 303.  Based on multiple reasons, he concluded that "the overall evidence of record
indicates that [Warner] is self-imposing these limitations and actually has substantially more
capacity than she demonstrates."  Tr. 305.  Because he did not find that Warner was malingering,
the ALJ's reasons for doubting Warner's credibility must be clear and convincing and supported
by substantial evidence.

As one reason, the ALJ found that her "allegations are disproportionate to the objective
findings in the medical record."  Tr. 305.  He noted that Warner failed to give maximum or
consistent effort during her physical capacity evaluation.  *Id*.  Failing to fully perform on a
physical evaluation may be grounds for rejecting a claimant's testimony.  *Thomas,* 278 F3d at
959; *see also Rautio v. Bowen*, 862 F2d 176, 179-80 (8th Cir 1988) (determining that failure to
cooperate during examinations supported ALJ's conclusion that claimant was not credible).

As another reason, the ALJ noted that Warner "reported more severe symptoms at her
disability hearings than she had reported to her treating medical practitioners."  Tr. 205.  Failure
to report the claimed severity and intensity of pain to a medical provider is a proper reason to
discredit the testimony of a claimant.  SSR 96-7p, 1996 WL 374186, at *15.  In 2002, Warner
reported incredible pain in her wrists and forearms which "everything" makes worse and

"nothing" makes better.  Tr.  91, 273-75.  Yet she never reported these extreme symptoms to any

of her physicians.  As the ALJ stated, "[e]ither the claimant is exaggerating her symptoms or her

primary care practitioner has been providing her with narcotics for several years for no reason."

Tr. 302-03.

Further, Warner did not take the advice of any of her physicians to stretch, and instead

spent the majority of her days watching television or sleeping.  Tr. 736.  When a claimant makes

subjective statements about disabling symptoms, but fails to comply with recommended

treatment intended to alleviate the symptoms, an ALJ may reasonably reject the subjective

statements.  *Fair*, 885 F2d at 603 ("Another such form of evidence [to find a pain allegation

incredible] is an unexplained, or inadequately explained, failure to seek treatment or follow a

prescribed course of treatment."); *Orn v. Astrue,* 495 F3d 625, 638 (9th Cir 2007) (failure to seek

and follow treatment despite claims of debilitating symptoms is a sufficient reason to disregard

subjective testimony about the symptoms).

The ALJ also drew an adverse inference as to credibility from inconsistencies in

Warner's statements over time.  Tr. 305.  The ALJ may reject testimony when the claimant

engages in activities that are inconsistent with claimed limitation.  *Morgan*, 169 F3d at 600.  The

ALJ noted several such inconsistencies in the record.  For example, Warner claimed that all she

can do it sit at home and watch television, yet on one occasion in 2005 she rode a bicycle.

Tr. 498, 614, 736.  She also claimed in 2002 that she was too weak to push a button on a remote,

but at that time reported that she prepared her own meals, shopped weekly, and could drive a car.

Tr. 85-85, 93, 344.  Additionally, the ALJ noted that Warner had been inconsistent in reporting

her past illicit drug use.  Tr. 296.  In October 2006 she told Thomas Gerow, M.D., in the hospital

14 - FINDINGS AND RECOMMENDATION

emergency room that she had no history of drug use, but then told Kimberly Cronin, M.D., in February 2007 at the emergency room that she had done methamphetamine, but that it "has not been lately." Tr. 487, 546. *See Verduzco v. Apfel*, 188 F3d, 1087, 1090 (9th Cir 1999) (relying on inconsistent statements about alcohol use to reject claimant's testimony). These inconsistencies are germane reasons to find Warner not credible.

**C.      Conclusion**

The ALJ gave other reasons for doubting Warner's credibility. Even if those other reasons are ignored, the ALJ considered appropriate factors and reached conclusions that are supported by substantial evidence in the record. The findings are sufficiently clear and convincing to permit the court to conclude that the ALJ did not arbitrarily discredit Warner's testimony. Even if the record supports another interpretation of the evidence more favorable to Warner's claim, the court cannot disturb the ALJ's rational findings of fact. *Tommasetti*, 533 F3d at 1038. Accordingly, the ALJ's credibility determination should not be disturbed.

///

///

**II.      Medical Opinions**

**A.      Legal Standards**

The ALJ is responsible for resolving conflicts and ambiguities in medical evidence. *See Batson*, 359 F3d at 1195 (citation omitted). The Ninth Circuit distinguishes between the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (non-examining physicians). *Lester v. Chater*, 81 F3d

15 - FINDINGS AND RECOMMENDATION

821, 830 (9th Cir 1995).  Generally, a treating physician's opinion is afforded the greatest weight

in disability cases because "the treating physician is employed to cure and has a greater

opportunity to know and observe the patient as an individual."  *Ramirez v. Shalala*, 8 F3d 1449,

1453 (9th Cir 1993) (citations and internal quotation marks omitted).  The opinion of an

examining physician is, in turn, entitled to greater weight than the opinion of a non-examining

physician.  *Pitzer v. Sullivan*, 908 F2d 502, 506 n4 (9th Cir 1990).

A treating physician's opinion on the nature and severity of the claimant's impairment is

given controlling weight when it is "well-supported by medically acceptable clinical and

laboratory diagnostic techniques and is not inconsistent" with other substantial evidence in the

record.  20 CFR § 416.927(d)(2).  An uncontradicted treating or examining doctor's opinion may

only be discredited for "clear and convincing reasons."  *Thomas,* 278 F3d at 957 (citation

omitted).  If contradicted by the opinion of another doctor, the ALJ may reject a treating or

examining doctor's opinion by providing "specific and legitimate reasons" supported by

substantial evidence in the record.  *Lester*, 81 F3d at 830 (citation omitted).

Only "acceptable medical sources" can give medical opinions to establish the existence

of a medically determinable impairment.  20 CFR §§ 416.913(a), 416.927(a)(2).  "Acceptable

medical sources" include licensed physicians and licensed psychologists, but not licensed

clinical social workers and therapists.  20 CFR § 416.913.

### B.    Analysis

#### 1.    Dr. Barker

Warner argues that the ALJ erred by ignoring the opinion of her treating physician,

Dr. Barker, that she is disabled from working.  The ALJ is "not bound by the uncontroverted

opinions of the claimant's physicians on the ultimate issue of disability" if the ALJ gives clear and convincing reasons for rejecting those opinions. *Reddick*, 157 F3d at 725, quoting *Matthews v. Shalala*, 10 F3d 678, 680 (9th Cir 1993). If a treating physician's opinion on disability is controverted, that the ALJ can reject it "only with specific and legitimate reasons supported by substantial evidence in the record. In sum, reasons for rejecting a treating doctor's credible opinion on disability are comparable to those required for rejecting a treating doctor's medical opinion." *Id* (internal citation omitted).

Dr. Barker's disability opinion is controverted by five other doctors. The other examining physician, Dr. Hill, found that Warner could work at a sedentary to light level. Tr. 189-90, 225-30. The other reviewing physicians agreed that Warner was capable of performing some form of work, either light or sedentary. Tr. 211-15, 699, 704-11. Therefore, the ALJ was required to provide only specific and legitimate reasons to reject Dr. Barker's opinion.

The ALJ dismissed Dr. Barker's disability opinion for three reasons.[2] First, he stated that it "is an opinion on the ultimate issue and is reserved to the Social Security Commissioner as well as being outside the medical realm." Tr. 303. The determination of disability is reserved for the Commissioner. 20 CFR § 416.927(a)(2). However, opinions from a medical source "on issues reserved to the Commissioner must never be ignored. . . If the case record contains an opinion from a medical source on an issue reserved to the Commissioner, the adjudicator must

---

[2] Warner also contends that the ALJ did not fully develop the record to determine whether Warner has a psychological impairment. Because Warner has pointed to no evidence of any psychological impairment, this argument is without merit. *See Mayes v. Massanari*, 276 F3d 453, 459-60 (9th Cir 2001) ("an ALJ's duty to develop the record is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence.")

17 - FINDINGS AND RECOMMENDATION

evaluate all the evidence in the case record to determine the extent to which the opinion is supported by the record." SSR 96-5p, 1996 WL 374183, *3 (July 2, 1996). Therefore, this reason alone is insufficient to dismiss Dr. Barker's disability opinion.

Second, the ALJ dismissed Dr. Barker's disability opinion because "other than the initially successfully treated carpal tunnel syndrome, chronic neuropathic pain over the period under review is generally not supported by nerve conduction studies and spinal MRIs." Tr. 303. Dr. Barker lamented that he could not explain the cause of Warner's pain. Tr. 431-32, 423. Given the lack of any objective source of discomfort, Dr. Barker relied almost entirely upon Warner's complaints. An ALJ may reject a treating physician's opinion if it is based "to a large extent" on a claimant's self-reports that have been properly discounted as incredible. *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F3d 595, 602 (9th Cir 1999), citing *Fair*, 885 F2d at 605. Because the ALJ discounted Warner's testimony as not entirely credible, he could properly reject Dr. Barker's opinion to the extent that it is based on Warner's subjective reporting. While Dr. Barker's opinions were supported by written evaluations describing Warner's complaints, this does not change the fact that they were unsupported by objective medical evidence.

Also, when confronted with conflicting medical opinions, the ALJ need not accept a treating physician's opinion if it is conclusory and unsupported by clinical findings. *Tonapetyan v. Halter*, 242 F3d 1144, 1149 (9th Cir 2001). One of Dr. Barker's diagnoses, cervical radiculopathy, was ruled out by several other doctors who could find no medical evidence of that ailment. Tr. 405, 461, 474.

Warner also argues that the ALJ erred by rejecting Dr. Barker's opinion that she suffered from fibromyalgia. In reading the record in the light most favorable to Warner, the ALJ included

fibromyalgia as one of her impairments.  Tr. 300.  Within the specific context of fibromyalgia, an

ALJ errs in discounting the opinions of a physician by requiring "objective evidence for a

disease that eludes such measurement."  *Benecke v. Barnhart*, 379 F3d 587, 592 (9th Cir 2004)

(citations omitted).  However, the American College of Rheumatology ("ARC") defines

fibromyalgia as "widespread pain in all four quadrants of the body for a minimum duration of 3

months and at least 11 of the 18 specified tender points."  *Jones v. Astrue*, 2008 WL 4609974, at

*3 (CD Cal Oct. 10, 2008) (citation omitted).  The only evidence in the record of testing for

tender points was by Dr. Maier on May 5, 2005, when he reported "widespread trigger point

tenderness."  Tr. 685.  It appears that Dr. Barker never evaluated Warner for any of the requisite

tender points.  Therefore, the evidence supporting a diagnosis of fibromyalgia is tenuous at best.

In sum, the ALJ did not ignore Dr. Barker's disability opinion, but, based on due

consideration of appropriate factors, gave a sufficiently specific and legitimate reason for finding

the opinion unsupported and inconsistent with the record as a whole.

### 2.    Dr. Hill

Warner contends the ALJ erred in interpreting Dr. Hill's evaluation of her functional

limitation as light instead of sedentary.  During his 15 months of treatment, Dr. Hill's opinion of

Warner's physical capacities alternated between sedentary and light.  His last evaluation dated

June 2004 stated that Warner was "probably limited to a sedentary/light physical capacity

range."  Tr. 225.  Warner argues that the ALJ more or less averaged Dr. Hill's opinions, instead

of adopting and interpreting his final opinion as limiting Warner to sedentary work.  The court

must affirm findings if they are supported by inferences in the record.  *Batson*, 359 F3d at 1193.

Given Dr. Hill's shifting opinions, the ALJ reasonably interpreted them as limiting Warner to something less than light level work, as opposed to only sedentary work.

### 3.    Dr. Eder

Warner also contends that the ALJ erred by rejecting the opinion of Dr. Eder, a non-examining physician, that Warner could only do sedentary work.  Tr. 697.  Although Dr. Eder did limit Warner to sedentary work, the ALJ erroneously stated that Dr. Eder limited Warner to a "reduced range of light exertional level activities."  Tr. 304.  As a result, the ALJ did not specifically reject Dr. Eder's opinion.  Assuming that the ALJ made a typographical error, then this court can infer that he did reject her opinion by instead adopting the opinions of Drs. Lahr, Hill, Jensen, and Prichard that Warner is capable of reduced light level work.  As Dr. Eder's opinion is controverted by the other examining and non-examining physicians, the ALJ had a valid reason to discount it.

### 4.    Other Medical Testimony

Finally, the ALJ dismissed the opinion of Park, an occupational therapist, that Warner is limited to sedentary work.  Therapists are not acceptable medical sources under the Commissioner's regulations.  20 CFR § 404.927(a); SSR 06-03p, 2006 WL 2329939 (Aug. 9, 2006).  While Park is not an acceptable medical source, he may provide useful information about Warner's ability to function.  20 CFR § 416.913.  The opinions of therapists may be rejected for germane reasons, such conflicting medical evidence.  20 CFR § 404.927(a); *Lewis v. Apfel*, 236 F3d 503, 511 (9th Cir 2001).

The ALJ rejected Park's opinion as not supported by his objective findings.  Park found that Warner was capable to lifting 15 pounds occasionally, which is more than the 10-pound

limit for sedentary work.  In addition, Park found that Warner did not put forth full effort on the physical tests.  Failing to fully perform on a physical evaluation may be grounds for rejecting a claimant's testimony.  *Thomas,* 278 F3d at 959.  This is a germane reason for the ALJ to reject Park's opinion.

Warner also contends that the Commissioner relied on Park's report to discredit Warner while inconsistently rejecting his opinion of a sedentary work limitation.  That argument is misguided.  The ALJ accepted the observations of Park that Warner put forth less than full effort in her physical evaluation based on the objective testing.  The ALJ found it inappropriate, however, to form an opinion based on such an inconclusive physical evaluation.

### C.    Conclusion

In sum, the ALJ properly evaluated the medical evidence in the record.  Because his findings are supported by substantial evidence, they should be affirmed.

## III.    Lay Witnesses

### A.    Legal Standards

Family members and others in a position to observe a claimant's symptoms and daily activities are competent to testify as to the claimant's condition.  *Dodrill v. Shalala,* 12 F3d 915, 918 (9th Cir 1993).  Such testimony cannot be disregarded without comment.  *Nguyen v. Chater*, 100 F3d 1462, 1467 (9th Cir 1996).  While the ALJ must take into account lay witness testimony about a claimant's symptoms, the ALJ may discount that testimony by providing reasons that are "germane to [the] witness."  *Carmickle v. Comm'r, Soc. Sec. Admin.,* 533 F3d 1155, 1164 (9th Cir 2008) (citation omitted).

### B.    Analysis

Warner contends that the ALJ failed to properly weigh the evidence of lay witnesses Britton Hurst ("Hurst") and Judy Lloyd ("Lloyd").

In a questionnaire completed on December 11, 2002 (Tr. 94-105), Hurst stated that Warner leaves home daily, goes to the grocery store weekly, and visits friends four to five time per week.  Tr. 95.  He also noted that she watches TV about three hours a day, walks about a quarter mile once or twice a week, makes food for herself and her family daily, does laundry weekly, but cannot dust, vacuum, or take out the trash because these activities are too painful. Tr. 97-98, 100-01.  Hurst also reported that he does not know how Warner spends an ordinary day.  Tr. 104.

Lloyd, Warner's longtime friend, completed a questionnaire dated April 4, 2005 (Tr. 622-29), stating that Warner is in constant pain, cannot wear clothes with buttons or zippers, cares for her cat, prepares simple meals, shops weekly, has difficulty driving, and has given up most of her hobbies.  Tr. 623-27.

The ALJ found accepted these witnesses' statements "as descriptive of [Warner's] perceptions," but as insufficient support to alter the RFC because "the behavior observed by the witness is not fully consistent with the medical and other evidence of record."  Tr. 304-05.  In other words, although Hurst and Warner may have accurately reported their observations of Warner's activities, the issue is whether Warner has greater physical capacity, given the nature of her physical impairments.  Based on the medical evidence and Warner's lack of credibility, the ALJ had a germane reason to reject the lay witnesses' testimony as to Warner's RFC.

## IV.    <u>Vocational Assessment</u>

### A.    <u>Legal Standards</u>

The Commissioner relies primarily on the DOT for information about the requirements of work.  20 CFR Part 404, Subpt P, App 2 § 200.00(b); SSR 00-4p, 2000 WL 1898704 (Dec. 4, 2000).  An ALJ may rely on the testimony of a VE for additional guidance, but the information should be consistent with the occupational information in the DOT.  SSR 00-4p, 2000 WL 1898704 at *2.  When an apparent conflict exists between information in the DOT and evidence provided by the VE, the ALJ must elicit a reasonable explanation and resolve the conflict before relying on the VE's testimony to find the claimant not disabled.  *Id.*  The ALJ has an affirmative responsibility to ask about any possible conflict between the evidence given by the VE about the requirements of an occupation and the information in the DOT.  *Id* at *4.  An ALJ may rely on expert testimony which contradicts the DOT if the record contains persuasive evidence to support the deviation.  *Johnson v. Shalala*, 60 F3d 1428, 1435 (9th Cir 1995).  Vocational conclusions reached by an ALJ without input from a VE represent an improper reliance upon information outside the record.  *Burkhart v. Bowen*, 856 F2d 1335, 1341 (9th Cir 1988).

**B.    Analysis**

At step five, the ALJ determined that Warner could work four jobs:  touch up screener for printed circuit board assembly, information clerk, cafeteria attendant, and security guard.  Tr. 306.  The ALJ reduced the number of jobs available for the security guard position by 10% to account for Warner's need to limit her exposure to the sun.  The VE testified that although the DOT classified two of these jobs as semiskilled, these positions can now be learned in 30 days and, thus, would be classified as unskilled when the DOT is republished.  *Id*.

Both the Commissioner and Warner agree that the touch up screener job requires frequent fingering. Thus, that job must be disregarded based on Warner's ability to finger only occasionally.

Warner maintains that the first hypothetical presented to the VE was incomplete as it did not include her inability to crawl. The ALJ's RFC states that Warner could crawl both "occasionally" and "not at all." Tr. 301. However, his hypothetical question posed to the VE included occasional crawling. A hypothetical question must set out all of the claimant's limitations and restrictions. *Embrey v. Bowen*, 849 F2d 418, 422 (9th Cir 1988). Even if the first hypothetical to the VE did not include Warner's inability to crawl, this error is harmless. According to both the DOT and common knowledge, none of the three remaining positions require an individual to crawl. *See* DOT 237.367-022, 311.677-010, 372.667-034.

Warner also asserts that the position of cafeteria worker should be eliminated because it requires fine fingering which she can only do occasionally. Warner is mistaken. The DOT 311.677-010 provides that a cafeteria attendant is required to finger only occasionally which Warner can do. Thus, this job is consistent with the ALJ's RFC.

Warner further contends that she is limited to sedentary work, as opposed to the ALJ's RFC of reduced light work. Because two of the jobs are classified as light work, she argues that they should be eliminated as possibilities. Even if those two jobs are eliminated, there is no need to reverse and remand the ALJ's decision. A district court may modify the Commissioner's administrative determination that a claimant could do light work into a finding that he could perform sedentary work without the need to remand. *Blacknall v. Heckler*, 721 F2d 1179 (9th Cir

1983);[3] 20 CFR § 404.1567(b).  Incorporating the sedentary work capability determination

within the finding of light work capability is not error "unless there are additional limiting

factors such as loss of fine dexterity or inability to sit for long periods of time."  20 CFR §

416.967(b).  Those additional limiting factors are not present here.

     If Warner is only limited to sedentary work, the Commissioner asserts that she can still

perform the job of information clerk.  This job has 500 positions in Oregon and 75,000 in the

national economy.  Tr. 306.  A showing of a significant number of jobs in one occupation is

sufficient.  20 CFR § 416.996(b).  The Ninth Circuit "has never clearly established the minimum

number of jobs necessary to constitute a 'significant number.'"  *Barker v. Sec'y of Health and*

*Human Servs.*, 882 F2d 1474, 1478 (9th Cir 1989).  However, it has cited with approval other

cases finding even a few hundred jobs sufficient.  *Id* at 1478-79; *see also Thomas v. Barnhart*,

278 F3d 947, 950 (9th Cir  2002) (1,300 jobs in the state and 622,000 jobs nationally sufficient);

*Moncada v. Chater*, 60 F3d 521, 524 (9th Cir 1995) (2,300 jobs in the county and 64,000

nationwide sufficient).  If Warner is indeed limited to only sedentary work, only one

occupational possibility would remain, namely that of information clerk numbering 500

positions.  However, that number is sufficient for the ALJ to meet his burden under step five.

     Thus, even if the ALJ erred in determining that Warner is capable of light level work, this

error is harmless.  As the ALJ found a substantial number of jobs under step five that comply

with a sedentary limitation, the decision of the Commissioner should be affirmed.

## **RECOMMENDATION**

---

[3] *Blacknall* addressed the issue under the DIB.  The wording under DIB is identical to the section pertaining to SSI benefits, which states "[i]f someone can do light work we determine that he or she can also do sedentary work[.]"  20 CFR § 416.967(b).

Based on the foregoing, the ALJ's determination that Warner does not suffer a disability and is not entitled to SSI benefits is based on correct legal standards and supported by substantial evidence.  Thus, the Commissioner's final decision should be affirmed.

///

///

## SCHEDULING ORDER

Objections to the Findings and Recommendation, if any, are due March 23, 2009.  If no objections are filed, then the Findings and Recommendation will be referred to a district judge and go under advisement on that date.

If objections are filed, then a response is due within 10 days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendation will be referred to a district judge and go under advisement.

DATED this 6th day of March, 2009.

s/  Janice M. Stewart_____
Janice M. Stewart
United States Magistrate Judge